EMIL VACEK *v.* STATE OF MARYLAND, FOR THE USE OF MAMIE ROKOS ET AL.

[No. 31, April Term, 1928.]

*Decided June 20th, 1928.*

The cause was argued before PATTISON, ADKINS, DIGGES, PARKE, and SLOAN, JJ.

*William L. Marbury* and *Fendall Marbury,* for the appellant.

*Daniel S. Sullivan,* with whom was *S. Scott Kirkley* on the brief, for the appellee.

DIGGES, J., delivered the opinion of the Court.

The accident for which damages were recovered in this suit occurred while one William C. Vojik was driving an automobile belonging to Emil Vacek, the defendant. The occupants of the automobile were five in number, the driver and Havelick occupying the front seat, and Rokos, Lehicka and Vacek the rear seat. The accident resulted in the death of Rokos, and the suit is by the State of Maryland for the use of his widow and two infant children against Vacek. It occurred while the party were returning from a shore owned by Vacek on Middle River between 12.30 and 2 o'clock in the morning of November 29th, 1926. The day before the accident, being Sunday, the occupants of the car had gone (but not together) to Dundalk, a shore resort; Vacek having gone there in his own machine with some other guests, but, except for Havelick, not those who were in the machine at the time of the accident. About 7 o'clock that evening one Hoska borrowed the defendant's machine to go back to Baltimore, and Vojik, although he had no operator's license, accompanied Hoska to Baltimore and brought the machine back to Dundalk. About 11 o'clock P. M. the defendant decided to go to his own shore. In the examination of the defendant he was asked:

"Q. Just tell the jury in your own way what happened after Mr. Rokos got in your machine, whether you had any conversation about driving these gentlemen out to the trolley line or taking them down to your shore on Middle River? A. Well, they called for me, and I was sitting at the table there, with the rest of the fellows sitting down, and they said, 'Emil, let's go,' and they went out, and they were all in the machine. I did not know he was in there. I got in the car, and Willie was at the wheel. I said, 'Willie, let me get there and drive out.' He said, 'I can drive.' I said, 'I know, but go ahead and let me get there.' Q. What conversation did you have with these gentlemen who were in the car in reference to how they could get back to Baltimore? A. Well, I mentioned it to them some time before, 'I am going to make a trip down to my shore at Middle River for some stuff I have down there,' and I suggested, 'I am going down, and if you fellows don't want to go down, I will take you to the trolley line and you get off.' I said, 'I am going down, if them tools lay out and open to the rain they will get ruined, and besides somebody may take them away from me.' And then they suggested, 'Well, we will go along.' I said, 'All right, and I bring them back.' My shore is about almost an hour's ride from the Dundalk shore. * * * Q. Well, tell about that conversation, especially what Mr. Rokos said, if anything? A. They asked, 'Where are you going?' and I said, 'I am going down to the shore,' and I said, 'If you fellows want to get off,' I said, 'All right, here is the car.' And they said, 'Oh, we will take the trip for curiosity to see how you are building at your place.' It was more curiosity than anything else. We got to my shore about 12 o'clock. Q. And after you got there what did you do? A. I went there to look my tools over, gather up things, and they went around the place, and looked it over, and talked about the cheapness of lumber, and stuff that I bought—I bought a lot of stuff, and they talked about it, and took a little time, and one said, 'Let's go.' I said, 'All right.' By the time I locked the doors, why, they was gone out to the machine, and I got to the machine, and there was Willie and Havelick.

in the car. I gets in. I said, 'Willie, let me drive that machine.' 'Oh,' he said, 'I can drive, it will be all right.' Mr. Havelick said, 'Oh, let him alone, he is safe there,' and then, as he said that, Mr. Lehicka and Mr. Rokos came right along and sat down, and had to move back to let get back. They said, 'What is the trouble?' I said, 'Willie wants to drive.' They said, 'All right, let him drive.' Q. Who said that? A. Mr. Rokos and Lehick said, 'All right, let him go ahead.' We had to wedge together when they pushed over my feet. It was cramped, the car, the Ford sedan, was cramped, and you had to jerk over, the car is so small. I said, 'All right, but I don't feel that way.' They said, 'Oh, you drive plenty, he is all right, let him drive.' That was the whole situation of it."

On cross-examination the defendant said: "When I got out to my machine to drive it from Dundalk shore to my shore, Willie was at the wheel, and I told him to get away from it, and he let me drive. On the way back from my shore Willie got the wheel again and that time I let him stay there. My only knowledge from personal observation of his experience was that one trip that he made that Sunday afternoon when he drove my machine from town down to the Dundalk shore, and I have heard him tell me many a time that he drive for a man at St. Helena. Before I left the Vacek shore to come home I did not ascertain from Vojik whether or not he had a license to drive a machine. I was figuring he is a competent driver and he should carry one. I didn't ask no questions. I was sitting on the right of Mr. Rokos in the back. Mr. Lehicka was sitting on my left side in the corner. * * * When I got in the machine Havelick was sitting beside Vojik who was driving. I was the third one. I was talking to them about driving, and then Mr. Lehicka and Mr. Rokos got in right at one time, came right in the side. I do not know whether Rokos got in before Lehicka or not. They were both coming at one time, one right after the other. When I actually got to the machine before I got in Rokos and Lehicka were coming from the shore end from the front around the construction. After I

got in I had to wait. I don't think about a minute and a half or two. Q. And the conversation you had was before Rokos and Lehicka got up there, wasn't it? You had your conversation about driving just as soon as you got there? A. When I was standing in the car they happened to come in, and had the conversation, and they said, 'What is the trouble?' and I told them, and they said, 'All right, let him drive.' Q. Who said that? A. Mr. Rokos and Mr. Lehicka. Rokos first, and Lehnicka with him. Q. You mean to say you would not let Vojik drive the machine if your guests had not said so, is that so? A. I trusted my friends, because they knew he could drive as well as I did. Q. Who trusted who? A. The guests trusted that he will drive, he will drive all right all right, they trusted him as well as I did, and thought he was a competent driver. That is what they said, 'Let him go ahead, he is all right,' because they knew he drove that evening, that afternoon. Q. Didn't I understand you to say that when you got in the back of the machine and sat down it took Mr. Rokos and Mr. Lehicka about a minute and a half to come up? A. I was not sitting there, I was standing up inside the machine, talking to Willie, and when they just came in, then I had to move back and sit down. Q. Why did you go in the back of the machine at all before you decided who was to drive the machine? A. He was in the machine. Q. Who was in the machine? A. Mr. Willie and Havelick was in front. I said, 'Willie, let me get in there.' You have to crawl out that seat, and it is all cramped. And I said, 'Willie, let me get in there and drive.' Havelick said, 'It is all right, let him drive.' Q. Who said that? A. Mr. Havelick. Q. Rokos was not there at all? A. And then come Mr. Lehicka and Rokos in, and I had to move back and sit down. That is what I did. I had to sit back. And that is where they said, 'Oh, let him drive; you drive plenty,' and Lehicka said, and Mr. Rokos said, 'Now, let him drive,' he said, 'You drive plenty, sit here with me'? Lehicka said, 'He is all right, he is pretty good driver.' And that was the whole situation. Q. What did Rokos know about his driving? A. He knew he came back that afternoon."

The testimony of Vojik was that he went down to Dundalk shore about 1.30 or 2 o'clock in the afternoon on a street car; he did not go with Vacek or Rokos; he came back to town that afternoon in Vacek's automobile and drove it back to the shore. He knew Vacek well at that time; also knew Rokos. He was not a licensed chauffeur and never had a license. He had started the trip which ended in the accident from Vacek's shore; he did not know how far it was from the Dundalk shore; it would take about an hour to go there from Dundalk shore. When he left the Dundalk shore to go to Vacek's shore, he went in Vacek's machine, together with Vacek, Havelick, Rokos, and Lehicka. Vacek drove the machine from Dundalk shore to his own shore, and during that trip he was sitting in front with Vacek, and the other three men were in the rear. They left Vacek's shore to come home about 12.30 or 1 o'clock in the morning; Rokos was in the back; the witness was behind the wheel. The brakes on the Ford sedan held all right; he had driven the car enough to know whether it was running all right or not, and it was in running condition; he did not know how old a Ford it was. When they started back from Vacek's shore, witness got in the car first and sat behind the wheel, the rest got in the back, Havelick in the front, and no more was said about it. "They let me drive."

"Q. When you say they let you drive, you mean the other people in the car? A. They were all satisfied with my driving. (The Court): Did they have any talk or make any arrangements? Q. That is what I want to know. How did they express themselves about the driving? A. I did not pay much attention to it. I started the car and went off. None of them never told me not to drive it. Q. Did they say anything to Mr. Vacek, to let Jimmie drive, or something like that? A. I don't know. Q. Now, try to remember about this. When they all got in to drive home about half past one, what did the other people in the car say along the line of what you just told us a minute ago about, like Mr. Vacek being satisfied for you to drive? Did they say anything to Mr. Vacek? A. I don't know what

they said to Mr. Vacek. I did not hear anything. Q. You did not hear that? A. I did not hear what they were telling him back there. Q. They said something about it, though? A. Well, I don't know. Q. How about the man sitting along side of you, you could hear him? A. He never spoke to me. Q. Did he say anything to Mr. Vacek? A. I don't know whether he was talking to him or not. I had all I wanted to do to watch the road."

We have deemed it advisable to set out at length the testimony in reference to the circumstances under which Vojik became the driver of the machine on the trip from the owner's shore to Baltimore, during which the accident occurred, because the appellant's contention turns upon the effect of this testimony. It shows that, previous to the start of the return trip, the same five people had gone from Dundalk to Vacek's shore; that when they started from Dundalk, Vojik was at the wheel and was directed by Vacek, the owner, to give up the wheel, which he did, and it was taken by the owner, who drove the machine to his shore. That when they prepared to leave his shore to go home, Vacek locked the doors of his building and then went to the car, when he found Vojik and Havelick already in, Vojik occupying the driver's seat. Up to this point there is no conflict between the witnesses. From this point on, the testimony of Vojik is that he got in the car first and sat behind the wheel, with Havelick beside him in front, and the others in the rear seat, and they let him drive; that they were all satisfied with his driving, and none of them told him not to drive; that he did not hear any conversation between the others on the subject. The defendant's testimony on this point is to the effect that he was the third person to reach the machine; that finding Vojik and Havelick in the front seat when he reached the car, with Vojik at the wheel, he told Vojik to get out; that Vojik said, "I can drive," but he said, "Let me get there"; that at that time Havelick said, "Oh, let him alone, he is safe there"; that immediately thereafter Lehicka and Rokos came up and got in the back seat and asked, "What is the trouble?" and defendant said,

"Willie wants to drive," and they said, "All right, let him drive"

Under these circumstances the appellant at the close of the case offered a prayer requesting a directed verdict for the defendant, which was refused. The only error urged by the appellant now is that this prayer should have been granted. The contention of the appellant is that the uncontradicted evidence shows that Rokos, the plaintiff's intestate, actively acquiesced in Vojik's driving the car; and, if that be a fact, the law precludes the plaintiff from a recovery. We are unable to assent to this proposition. To agree to the appellant's contention, we would have to conclude, as a matter of law, that the acquiescence by Rokos in Vojik's driving the car thereby established the relationship of master and servant between Rokos and Vojik. The question therefore is, Was Vojik at the time of the accident the servant of the defendant, or was he the servant, for that particular trip, of all of the occupants of the car who consented to his driving? We have not been referred to, nor does there appear to be, a decision of this court on this identical point; neither have we been referred to any decision directly in point in any other jurisdiction. Many phases of the principle involved are to be found in the text books and reported cases, and the test generally accepted, in determining the relationship of master and servant, is, Has the alleged master the direction, supervision and control of the servant? In 26 *Cyc.* 1522 it is said: "The test is whether in the particular service which he is engaged or requested to perform, he continues liable to the direction and control of his original master, or becomes subject to that of the person to whom he is lent or hired or who requests his services. It is not so much the actual exercise of control which is regarded, as the right to exercise such control. To escape liability the original master must resign full control of the servant for the time being, it not being sufficient that the servant is partially under the control of a third person." *Pease v. Gardner,* 113 Maine 264, 93 Atl. 550. And in 39 *C. J.* 33, it is said: "He is deemed to be a master who has the superior choice, control, and direc-

tion of the servant, and whose will the servant represents not merely in the ultimate result of the work, but in the details." And at page 35: "The relation of master and servant exists whenever the employer retains the right to direct the manner in which the business shall be done, as well as the result to be accomplished, or, in other words, not only what shall be done, but how it shall be done. In as much as the right to control involves the power to discharge, the existence of the power to discharge is essential, and is an *indicium* of the relationship." And at page 1269: "To constitute the relation of master and servant for the purpose of fixing liability on the former for acts of the latter under the doctrine of *respondeat superior*, it is indispensable that the right to select the person claimed to be a servant should exist. Furthermore something more than the mere right of selection is essential to the relation. This right must be accompanied with the power and duty to control the alleged servant while in his employ; this, it is said, is one of the principal tests of the relation." "The test of one's liability for the act or omission of his alleged servant is his right and power to direct and control his imputed agent in the performance of the causal act or omission at the very instant of the act or neglect." *Standard Oil Co. v. Parkinson,* 152 Fed. 681.

Applying these general principles, the question therefore is: Did the defendant have the sole ultimate power and authority to permit or prohibit Vojik from driving the machine; did the defendant have similar authority to direct the course or route which was to be covered, and the manner of the operation; and did he have full authority to remove him from the position of operator of the machine, at his pleasure? It is true that there is some evidence to indicate that Rokos acquiesced in Vojik's driving, and even went so far as to say, "Let him drive," but the ultimate responsibility for his selection as driver must be held to have been in the defendant, because he alone had the power and authority to refuse or permit him to be so. Rokos alone, or in conjunction with the other guests in the car, could not have authorized Vojik to drive. The controlling decision must have been

made by the defendant, who also was the only person who had the right and power to end the employment; this he could do at any time he saw fit. If this were a case where two or more people embark upon a joint adventure or enterprise equally beneficial to all of them, in which all have equal authority in the selection or discharge of the common servant, and the jury could so find from the evidence, the legal proposition involved was properly presented in the defendant's ninth prayer, which was granted in connection with the plaintiff's third prayer.

According to the plaintiff's testimony, the case presented is one in which the owner, using his own machine, for his own purposes, invites four guests to accompany him; then, during the course of the journey, permits one of the guests to operate the machine, without protest from the other guests. The jury was entitled to believe this evidence, and the trial court was correct in refusing the defendant's first prayer for a directed verdict. We do not understand that the defendant contends that, if the owner of an automobile invites four guests to make a trip with him, for his own purposes, and during the trip allows one of them to drive the machine, and the other guests do or say nothing in opposition, that they or any one of them would be prevented from recovery in case of accident caused by the negligence of the guest who was driving. Yet that is exactly what the jury were at liberty to find from the plaintiff's evidence in this case. It is true that the defendant's evidence went further, and tended to prove that Rokos actively acquiesced in the selection of Vojik as the driver. This produced a conflict in the testimony as to just what Rokos did do, and presented a jury question, which necessarily would make it improper to instruct a verdict for the defendant. For this reason we would be bound to affirm the judgment. However, as stated, even if there was no other evidence in the case than the defendant's on this point, we do not think the legal proposition contended for by the appellant is sound, for the reason given, which is, that the ultimate power and authority in the selection, control, and discharge of Vojik rested in the defendant. In order to

410

prevent recovery in this case, the evidence must have shown at least that Rokos had the right to participate, with authority, in the selection, control, and discharge of the driver.

The exceptions as to the evidence were not urged in this court, in oral argument or on the brief, and upon examination, the rulings involved in these exceptions are clearly correct.

*Judgment affirmed, with costs to the appellee.*